UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTINA M. NEWELL,

                          Plaintiff,

          v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6262P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Christina M. Newell ("Newell") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 12, 16). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Newell's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.   Procedural Background

Newell protectively filed for SSI alleging disability on December 21, 2011, as a result of post-traumatic stress disorder ("PTSD"), bipolar disorder, asthma, scoliosis, and costochondritis.  (Tr. 194, 198).[1]  On May 9, 2012, the Social Security Administration ("SSA") denied Newell's claim for benefits, finding that she was not disabled.[2]  (Tr. 85).  Newell requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 94, 142-44).  The ALJ conducted a hearing on September 16, 2013.  (Tr. 29-77).  Newell was represented at the hearing by her attorney David Nelson, Esq.  (Tr. 29, 170).  In a decision dated November 22, 2013, the ALJ found that Newell was not disabled and was not entitled to benefits.  (Tr. 12-28).

On March 4, 2015, the Appeals Council denied Newell's request for review of the ALJ's decision.  (Tr. 1-7).  Newell commenced this action on May 4, 2015 seeking review of the Commissioner's decision.  (Docket # 1).

## II.   Relevant Medical Evidence[3]

### A.   Treatment Records

#### 1.   Livingston County Mental Health Services

Treatment notes from this facility date from February 2006.  (Tr. 412-13).  At that time, Newell presented for a "checkup" for suicidal ideation.  (*Id.*).  Newell met with Alice Moine Rogstad ("Rogstad"), MSW.  (*Id.*).  The treatment notes indicate that Newell had a

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Newell's previous application for benefits was denied on October 28, 2010.  (Tr. 195).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

history of depression and trauma, primarily stemming from an eleven-year history of sexual abuse perpetrated by several family members beginning when she was five years old.  (*Id.*). Newell lived with several different family members throughout her life, including her grandfather, grandmother, mother and father.  (*Id.*).  Newell first received mental health treatment at the age of ten, but did not find therapy helpful until she began treating with her most recent therapist.  (*Id.*).

Newell reported attending several different schools and experiencing behavioral problems, including assaultive behavior at school.  (*Id.*).  At the time of the appointment, Newell was attending GED classes.  (*Id.*).  Newell reported that she might suffer from a learning disability and had trouble reading.  (*Id.*).  Rogstad diagnosed Newell with PTSD and assessed her Global Assessment of Functioning ("GAF") at 55.  (*Id.*).

Newell was discharged from treatment on June 2, 2006.  (Tr. 411).  The discharge notes indicated that Newell was referred for treatment after a hospitalization in a different county.  (*Id.*).  Newell's attendance was too sporadic for her to receive treatment from a psychiatrist.  (*Id.*).  Her last visit was an emergency visit to address issues relating to her history of sexual abuse and trauma.  (*Id.*).  Newell reported that she was moving to a different county with her girlfriend and would receive mental health treatment in that county.  (*Id.*).  At discharge, Rogstad diagnosed Newell with PTSD and assessed a GAF of 60.  (*Id.*).

Newell attended an intake appointment with Ann Miller ("Miller"), LCSW, at Livingston County Mental Health Services on November 1, 2006.  (Tr. 408-10).  At the time, Newell was living with her mother and was unemployed.  (*Id.*).  She was ordered to attend mental health treatment after pleading guilty to endangering the welfare of a child.  (*Id.*).  Newell reported that the charge stemmed from an incident in which she tripped over a dog while

carrying a child. (*Id.*). Newell reported that she pled guilty in order to be released from jail. (*Id.*).

Newell reported one previous hospitalization in January 2006 that resulted from a suicidal gesture she made while holding a knife to her throat. (*Id.*). Newell also reported that she had received mental health treatment since she was young. (*Id.*). She denied any previous suicide attempts. (*Id.*).

According to Newell, her mother placed her for adoption because her mother's boyfriend did not want an infant. (*Id.*). Shortly after her birth, she began living with her grandfather and her older brother. (*Id.*). Newell reported that her brother and several other family members sexually abused her until she was fourteen and was removed from her grandfather's house. (*Id.*). After that, she lived with her mother. (*Id.*).

Newell reported that school was not difficult for her and that she did quite well, although Miller opined that this report appeared inconsistent with Miller's observations and Newell's ability to complete the intake form. (*Id.*). According to Newell, she dropped out of school in the tenth grade after the death of one of her friends. (*Id.*). Newell reported that she was attempting to obtain her GED and was receiving services through VESID. (*Id.*). Newell expressed an interest in becoming a math teacher or a mechanical engineer, although Miller observed that those goals seemed "at odds" with her capabilities. (*Id.*). Newell reported that she had never been employed, but likely would start soon at an ARC work placement through VESID. (*Id.*).

Newell reported that she had a three-year relationship with her previous girlfriend and had been dating her current girlfriend for the past year. (*Id.*). According to Newell, her current girlfriend had two children, one of whom Newell had been accused of endangering.

(*Id.*).  As a result of the incident, Newell was not allowed contact with her girlfriend's children.
(*Id.*).  Newell and her girlfriend continued to try to see each other and hoped that the order of
protection would be revoked in three years.  (*Id.*).

Newell reported that she had been prescribed Zoloft, Risperdal and Trazadone,
which were reportedly helpful.  (*Id.*).  According to Newell, she suffered from fears, moodiness,
anger and temper problems, and sleep disturbance, including nightmares involving past sexual
abuse that occurred approximately one to three times weekly.  (*Id.*).  Newell also reported
experiencing irritability and anger outbursts, and difficulties with concentration and memory.
(*Id.*).

Miller diagnosed Newell with PTSD and assessed a GAF of 55.  (*Id.*).  She
recommended medication management with a psychiatrist and individual counseling sessions to
focus on Newell's goals of securing training and employment.  (*Id.*).

Newell was discharged from treatment on January 31, 2007, after attending three
sessions.  (Tr. 407).  Miller reported that Newell had difficulty attending appointments due to
transportation issues.  (*Id.*).  During her counseling session on January 31, 2007, Newell reported
that she continued to attend BOCES classes and school, had secured a babysitting job, and was
not experiencing any mental health symptoms.  (*Id.*).  Newell felt that she was doing well and
wanted to stop therapy.  (*Id.*).  Miller concurred, and Newell was discharged from counseling
treatment with the understanding that she would continue to receive medication management
through her primary care physician.  (*Id.*).

2.      **Noyes Mental Health Services**[4]

Treatment notes from Noyes Mental Health Services date from November 15, 2011.  (Tr. 275).  On that day, Newell met with Melissa Wheeler ("Wheeler"), MFT, for an individual counseling session.  (*Id.*).  Her mental status exam was essentially normal, except for a mildly depressed mood.  (*Id.*).  During the session, Newell reported feeling exhausted due to ongoing nightmares.  (*Id.*).  During a session on December 5, 2011, Newell reported that she was able to relax and a night light she had put in her bedroom was helpful with her nighttime difficulties.  (Tr. 276).  Newell reported that she had started to date her best friend.  (*Id.*).

During her next session on December 19, 2011, Newell reported that she blamed her victim and her victim's mother for bad experiences in her life, including getting Newell's mother evicted from an apartment.  (Tr. 277).  According to Newell, she wanted to cause the victim pain similar to that which she had experienced when her mother was evicted.  (*Id.*). Wheeler explored with Newell how she could better express her pain in the future.  (*Id.*).

Newell attended another session with Wheeler on January 9, 2012.  (Tr. 278). Newell reported that she felt that she had self-control and would not reoffend.  (*Id.*).  On January 23, 2012, Newell attended another session with Wheeler in which they explored the reasons Newell chose her particular victim.  (Tr. 325).

Newell attended two therapy sessions with Wheeler in February 2012. (Tr. 326-27).  During the first session, Newell reported experiencing separation anxiety when separated from her girlfriend.  (*Id.*).  Due to her past relationship experiences, Newell worried that her girlfriend was cheating on her when they were not together.  (*Id.*).  Wheeler explained the difference between separation anxiety and generalized anxiety.  (*Id.*).

---

[4]  Portions of these treatment records are handwritten and difficult, if not impossible, to decipher. Accordingly, the Court has summarized only those portions of these records that are legible.

On February 27, 2012, Newell met with Glenn J. Hann ("Hann"), PNP, for a psychiatric evaluation. (Tr. 328-30). The treatment notes recounted Newell's childhood history, including her reports of sexual abuse perpetrated by family members. (*Id.*). According to the notes, Newell was previously arrested for endangering the welfare of a child. (*Id.*). Newell reported that she was falsely accused of throwing a child across the room. (*Id.*). At twenty-one, Newell was accused of raping a thirteen-year-old girl. (*Id.*). Newell served time in jail, was required to register as a level two sex offender, and was currently on probation as a result of the incident. (*Id.*). In addition to her therapy sessions, Newell also participated in the Sexual Offenders Group at Noyes Mental Health. (*Id.*).

At the time of the appointment, Newell was living with her uncle and his girlfriend. (*Id.*). Her uncle, who was one of the family members accused of abusing her when she was younger, was in jail for driving while intoxicated. (*Id.*). Newell reported that she planned to move in with her cousin. (*Id.*).

Newell reported that her moods were variable, sometimes elevated and sometimes depressed. (*Id.*). Her primary complaint was difficulty sleeping. (*Id.*). According to Newell, she was able to fall asleep, but frequently woke up, resulting in fatigue the following day. (*Id.*). Newell expressed a desire to manage her symptoms so that she could obtain her GED, attend college, and obtain employment. (*Id.*).

Hann's mental status examination was essentially unremarkable, although he noted that Newell appeared somewhat anxious. (*Id.*). He diagnosed Newell with PTSD and major depressive disorder and assessed a GAF of 50. (*Id.*). He increased her Zoloft dosage, instructed her to take Hydroxyzine at bedtime instead of during the day, and continued her other prescribed medications. (*Id.*). He advised Newell to avoid excessive caffeine, to use an alarm

7

clock, and to take her medications at the same time every day. (*Id.*). He recommended that she follow up with him in two weeks. (*Id.*).

In March 2012, Newell attended two therapy sessions with Wheeler and one medication management appointment with Hann. (Tr. 331-33). During her appointment with Hann, Newell reported that she was ready to move to a new apartment, but had discovered that the apartment was within 1,000 feet of a daycare center. (*Id.*). Newell's probation officer had indicated that it would not be a good idea for Newell to move into the apartment. (*Id.*). Newell complained of increased frustration and anger, and requested an increase in her prescribed dosage of Risperdal. (*Id.*). Hann suggested implementation of coping strategies and increased the Risperdal dosage. (*Id.*).

During her appointments with Wheeler, Newell reported that she had moved out of her uncle's apartment and was staying with one of her mother's friends until she could move in with her cousin. (*Id.*). Newell subsequently reported that she was unable to live with her cousin because they were both on probation and had not been approved to live together. (*Id.*). Newell reported weight gain, and Wheeler encouraged her to participate in an exercise routine. (*Id.*). Newell also reported some conflict with her girlfriend. (*Id.*).

Newell attended another session with Wheeler on April 12, 2012. (Tr. 334). Newell's mother and maternal aunt attended the appointment because they wanted to learn how to obtain permission for Newell to have contact with certain minors. (*Id.*). Newell reported increased irritability over difficulty in locating an apartment that would be acceptable to probation. (*Id.*). Newell also attended an appointment with Hann in April. (Tr. 335). During that appointment, Newell reported that she was sleeping "ok," but complained of a negative attitude causing frequent fights with her girlfriend. (*Id.*). Newell requested an increase in her

8

Risperdal dosage. (*Id.*). According to Hann, the Risperdal was causing fatigue and weight gain. (*Id.*). He recommended that she maintain her current dosage, but that she split the dosage and take it twice a day. (*Id.*).

On May 17, 2012, Newell attended another appointment with Wheeler. (Tr. 336). She reported that she was "fine" on her current medication, but continued to feel stressed over her homelessness. (*Id.*). Wheeler spoke with Newell's probation officer and then worked with Newell to identify potential apartments. (*Id.*). Newell reported that she had an appointment with her attorney to determine whether she could "get her disability benefits back." (*Id.*).

Newell returned for a session with Wheeler on June 19, 2012. (Tr. 338). During the session, Newell reported that she was depressed over continued difficulty finding housing and obtaining benefits through the Department of Social Services. (*Id.*). Newell brought in her autobiography, and Wheeler pointed out that she had left out several important issues. (*Id.*). Newell cancelled her appointment on July 9, 2012 due to lack of transportation. (Tr. 339).

In July 2012, Newell attended two therapy sessions with Wheeler and one appointment with Hann. (Tr. 340-42). During her appointment with Hann, Newell reported that she did not believe the Trazadone was helping with sleep. (*Id.*). She also reported continued weight gain from the Risperdal and felt that it was ineffective in controlling her symptoms. (*Id.*). Hann suggested that she discontinue Risperdal and begin taking Abilify. (*Id.*).

Newell's mother attended her July 10, 2012 session with Wheeler. (*Id.*). Newell reported that she was living in a boarding house outside of town and did not like living so far away, although she liked the women with whom she lived. (*Id.*). Newell reported that she enjoyed a recent family reunion. (*Id.*). Wheeler explained to Newell why her girlfriend would not be an appropriate candidate to act as her supervisor around minor children. (*Id.*). Newell's

mother indicated that she understood the expectations required of a supervising adult, and Wheeler indicated that she would speak to Newell's probation officer regarding her ability to be around minor children if supervised by her mother.  (*Id.*).

Newell's aunt attended her July 24, 2012 session with Wheeler in order to be approved as a supervising adult.  (*Id.*).  During the session, Newell and Wheeler again discussed why Wheeler had denied Newell's girlfriend's request to be recommended as a supervising adult.  (*Id.*).  On August 13, 2012, Newell attended another session with Wheeler.  (Tr. 343).  She reported animal-sitting with her girlfriend and working on her GED.  (*Id.*).

On August 30, 2012, Newell attended an appointment with Hann.  (Tr. 427).  She reported that she had discontinued Trazadone because she believed it was impeding her ability to fall asleep.  (*Id.*).  She reported that she was progressing with her efforts to obtain her GED, was no longer experiencing nightmares, but continued to have disputes with her housemates.  (*Id.*).  She also reported ongoing problems managing her anger.  (*Id.*).

Newell attended two therapy sessions with Wheeler in September 2012.  (Tr. 428-29).  Newell reported improved mood and concentration and less irritability.  (*Id.*).  She reported ongoing conflict with her housemates and that she continued to look for an apartment in town.  (*Id.*).  She continued to review her sexual history and also completed a secondary victim packet.  (*Id.*).  Newell was able to acknowledge that her criminal behavior had affected others besides her victim and herself.  (*Id.*).  Newell also reported that she had been diagnosed with kidney stones.  (*Id.*).

During an October 9, 2012 appointment with Hann, Newell reported ongoing difficulties falling asleep and maintaining her sleep.  (Tr. 431).  Hann recommended that Newell continue taking Trazadone and begin taking extended release Melatonin.  (*Id.*).  On October 11,

2012, Newell and her girlfriend attended a session with Wheeler.  (Tr. 432).  Newell's girlfriend expressed interest in qualifying as a supervising adult.  (*Id.*).  Newell reported that she had successfully navigated a conflict with one of her housemates and would be moving to an apartment in town in November or December.  (*Id.*).  Wheeler subsequently contacted Newell's probation officer, who agreed to authorize Newell's girlfriend as a supervising adult.  (Tr. 433). During a session with Wheeler on October 25, 2012, Newell reported that she was doing well on Abilify.  (Tr. 434).

Newell attended a therapy session with Wheeler and an appointment with Hann in November 2012.  (Tr. 437-38).  Newell reported that her doctor had discovered fluid around her liver, which was being monitored.  (*Id.*).  She reported that she was sleeping all right.  (*Id.*).

During December 2012, Newell attended two therapy sessions with Wheeler. (Tr. 439-41).  She reported that she had disclosed to her girlfriend her true relationship with her victim.  (*Id.*).  She also reported a depressed mood, which caused her to withdraw from her girlfriend.  (*Id.*).  Newell attended two additional therapy sessions in January 2013.  (Tr. 442-43). She reported feeling less depressed and that she had secured a two-bedroom apartment, although she was afraid to live alone.  (*Id.*).  According to Newell, her grandmother had agreed to provide financial assistance.  (*Id.*).  She also reported ongoing difficulties with her girlfriend.  (*Id.*).

During a therapy session on February 12, 2013, Newell reported that she enjoyed her new apartment, but spent a lot of time on the phone and watching movies because she did not like to be alone.  (Tr. 446).  She reported that she had enrolled in GED classes, but that she needed to take a placement test before starting.  (*Id.*).  She also indicated improvement in her relationship with her girlfriend.  (*Id.*).  Newell reported to Hann on February 25, 2013 that the Abilify caused her to be more quiet and fatigued and that she continued to experience fluctuating

moods. (Tr. 447). Hann attributed Newell's increased depression to her new living situation and being alone more frequently. (*Id.*). He suggested that she take Abilify only once a day and advised against increasing her Zoloft dosage. (*Id.*).

During a March 4, 2013 therapy session with Wheeler, Newell reported a recent incident with her girlfriend. (Tr. 448). According to Newell, they had had an argument while driving. (*Id.*). They both got out of the car and continued to argue. (*Id.*). Newell reported that she "blacked out," and when she came to she realized that she had pushed her girlfriend against the car. (*Id.*). Wheeler discussed with Newell the need to recognize when she is becoming upset and take a time out to calm down. (*Id.*). On March 18, 2013, Newell informed Hann that she had been violent with her girlfriend and that her girlfriend believed the Abilify was causing Newell to be mean. (Tr. 449). Hann discontinued the Abilify. (*Id.*).

On March 25, 2013, Newell attended an appointment with Wheeler. (Tr. 450). She reported decreased anger since discontinuing Abilify. (*Id.*). She continued to attempt to get into a GED class and reported attending a birthday party with her girlfriend the previous weekend. (*Id.*). She also indicated that her neighbors had raised concerns after discovering that she was a registered sex offender. (*Id.*). Newell attended another session on April 16, 2013 with her sister, who was seeking approval as a supervising adult. (Tr. 452). During the session, Newell and her girlfriend discussed their relationship problems. (*Id.*).

During an April 18, 2013 appointment with Hann, Newell reported decreased outbursts and a plan to begin attending GED classes the following week. (Tr. 453). Hann continued Newell's prescription for Zoloft. (*Id.*). On June 12, 2013, Newell reported to Wheeler that she was once again living alone, she cleaned her apartment daily, and her relationship with her girlfriend had improved. (Tr. 455).

Newell attended two therapy sessions with Wheeler in July 2013.  (Tr. 459-60).

She reported that she had taken her GED examination and was waiting for results.  (*Id.*).  She

was looking forward to attending a holiday party with her family.  (*Id.*).  She had recently begun

taking Topamax and was doing well.  (*Id.*).  She also reported that she had been diagnosed with

another kidney stone after going to the emergency room.  (*Id.*).  She reported ongoing conflict

with her girlfriend.  (*Id.*).

During August 2013, Newell attended a therapy session with Wheeler and an

appointment with Hann.  (Tr. 462-63).  She told Wheeler that she continued to have difficulty

controlling her anger.  (*Id.*).  She reported that she wanted to transfer to Livingston County

Mental Health so that she could be closer to her probation office.  (*Id.*).  Newell indicated that

others believed that she still was not opening up about her past experiences, which caused

ongoing anger issues.  (*Id.*).  Newell told Hann that Topamax was helping her to manage her

emotions and to improve her sleep.  (*Id.*).

### B.     **Medical Opinion Evidence**

### 1.     **Yu-Ying Lin, PhD**

On April 27, 2012, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a

consultative psychiatric evaluation of Newell.  (Tr. 289-93).  Newell reported that she was

approximately twenty-four years old and had been driven to the examination by her friend.  (*Id.*).

Newell reported that she had completed high school, but had not received a diploma, and that she

had attended special education classes from pre-school through the seventh grade due to a

learning disability.  (*Id.*).  She also reported receiving vocational training in auto mechanics.

(*Id.*).  She was unemployed, and her longest employment had lasted only four days.  (*Id.*).  She

reportedly left that employment because she was no longer needed.  (*Id.*).  She resided with a friend in the same building where her mother lived.  (*Id.*).

According to Newell, she had been hospitalized for a suicide attempt in December 2005 and had been receiving mental health treatment since she was approximately seventeen. (*Id.*).  She had suffered from bipolar symptoms since she was approximately twelve.  (*Id.*). According to Newell, she experienced depressive symptoms including dysphoria, psychomotor retardation, hopelessness, loss of usual interests, irritability, fatigue, worthlessness, diminished self-esteem, diminished sense of pleasure, and social withdrawal.  (*Id.*).  She also reported suffering from manic symptoms, including inflated self-esteem, psychomotor agitation, excessive involvement with pleasurable activities, flight of ideas increased, increased goal-directed activities, and elevated mood.  (*Id.*).  According to Newell, she experienced manic symptoms daily for approximately three to four hours.  (*Id.*).  She also reported difficulty falling asleep and increased appetite.  (*Id.*).

Newell reported that she had suffered from anxiety-related symptoms since approximately 2010, including excessive worry, fatigue, irritability, restlessness, difficulty with concentration, and muscle tension.  (*Id.*).  Additionally, she reported suffering from PTSD symptoms, including nightmares, flashbacks, avoidance behaviors, hyperstartle responses, hypervigilance, shortened perspective of the future, and intrusive thoughts.  (*Id.*).  She also reported that during the past year she experienced auditory hallucinations in which she would hear her deceased aunt open the door.  (*Id.*).

According to Newell, she was arrested in 2006 for endangering the welfare of a child and was sentenced to 94 days in jail.  (*Id.*).  In 2010, she was arrested for a criminal sex act in the third degree and was sentenced to imprisonment for five months and two weeks, followed

by a ten-year term of probation.  (*Id.*).  She is currently registered as a level two sex offender.  (*Id.*).

      Newell reported that she is able to care for her personal hygiene and to complete household chores, including cooking, laundry, and shopping, but has difficulty cleaning due to pain.  (*Id.*).  Newell reported that she is able to manage money, but experiences spending behaviors when she is in a manic state.  (*Id.*).  She does not drive, but is able to take public transportation and relies on her family for transportation.  (*Id.*).  She reported a good relationship with her friends and family and enjoys working on cars.  (*Id.*).  She copes by walking and isolating herself.  (*Id.*).

      Upon examination, Lin noted that Newell appeared casually dressed and well groomed.  (*Id.*).  Lin opined that Newell had fluent speech with clear voice and adequate language, coherent and goal-directed thought processes, dysphoric affect and dysthymic mood, clear sensorium, full orientation, good insight, good judgment, and below average to borderline intellectual functioning.  (*Id.*).  Lin noted that Newell's attention and concentration were intact.  (*Id.*).  According to Lin, Newell could perform simple calculations and serial threes, but appeared to process slowly.  (*Id.*).  Newell's recent and remote memory skills appeared to be impaired due to intellectual functioning.  (*Id.*).  According to Lin, Newell could recall three out of three objects immediately, zero out of three objects after delay, and could complete five digits forward and three digits backward.  (*Id.*).

      According to Lin, Newell could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, and relate adequately with others.  (*Id.*).  According to Lin, Newell could perform complex tasks with supervision, but could

not appropriately deal with stress due to lack of motivation and irritability. (*Id.*). Lin assessed

that Newell suffered from bipolar disorder not otherwise specified, generalized anxiety disorder,

PTSD, and learning disorder not otherwise specified. (*Id.*). Lin recommended that Newell

continue with psychological and psychiatric treatment and vocational training and rehabilitation.

(*Id.*). She assessed her prognosis to be guarded. (*Id.*).

### 2.    T. Harding, Psychology

On May 3, 2012, agency medical consultant Dr. T. Harding ("Harding")

completed a Psychiatric Review Technique. (Tr. 306-19). Harding concluded that Newell's

mental impairments did not meet or equal a listed impairment. (Tr. 306-07, 309, 311).

According to Harding, Newell suffered from mild limitations in her activities of daily living and

moderate limitations in her ability to maintain social functioning and concentration, persistence

or pace. (Tr. 316). According to Harding, insufficient evidence existed to determine whether

Newell had suffered from repeated episodes of deterioration. (*Id.*). Harding completed a mental

Residual Functional Capacity ("RFC") assessment. (Tr. 320-23). Harding opined that Newell

suffered from moderate limitations in her ability to complete a normal workday and workweek

without interruptions from psychologically-based symptoms, accept instructions and respond

appropriately to criticism from supervisors, get along with coworkers or peers without distracting

them or exhibiting behavioral extremes, and respond appropriately to changes in a work setting.

(*Id.*). Harding noted that Lin had opined that Newell's ability to deal with stress was impaired,

but he opined that Newell was capable of the four basic functions of simple work. (*Id.*).

### C.    Application for Benefits

Newell's mother, Lois Sackett, assisted her in completing her application for

benefits. (Tr. 213-22). Newell reported that she was born in 1988 and had never been

employed.  (Tr. 194, 198).  According to the application, Newell lived in an apartment with her family and was able to take care of her pets without assistance.  (Tr. 213-22).  Newell indicated that she was able to care for her personal hygiene without assistance, although her friends and family gave her frequent reminders to take her medicine.  (*Id.*).  Newell reported that she could prepare meals daily without assistance and was able to do household chores, including laundry, cleaning and mowing, although she sometimes required assistance lifting the laundry basket and pushing the lawn mower.  (*Id.*).  Newell reportedly left her house frequently, and was able to go out alone, but did not have a driver's license.  (*Id.*).  Newell reported that she was able to shop once a month for approximately ninety minutes.  (*Id.*).

According to Newell, she was able to pay bills, count change, handle a savings account, and use a checkbook.  (*Id.*).  During the day, she watched television.  (*Id.*).  She frequently spent time with others and went to medical appointments weekly.  (*Id.*).

Newell reported that she had difficulty lifting and sleeping, and could get upset over small things.  (*Id.*).  She reported difficulty paying attention and completing tasks, as well as an inability to follow written or spoken instructions.  (*Id.*).  She reported that she could get along with authority figures, but had difficulty managing stress and changes in routine.  (*Id.*).  She also reported difficulty remembering to attend her medical appointments.  (*Id.*).

D.    **Administrative Hearing Testimony**

During the administrative hearing, Newell testified that she was twenty-five and was not currently working.  (Tr. 37).  According to Newell, she lived alone in an apartment and received DSS rental assistance.  (Tr. 38).  Newell testified that she had not completed high school and had attempted to obtain her GED, but had failed the test.  (Tr. 61-62, 64).  According

to Newell, she had been in special education classes from pre-school until seventh grade, when she had been placed back into a regular classroom setting. (*Id.*).

Newell testified that she could "somewhat read" and could write "but not really." (Tr. 63). She had never had a driver's license and had been unable to secure employment because she did not have a GED. (*Id.*). Newell spent her days cleaning and watching television. (Tr. 65). According to Newell, her girlfriend performed the household shopping. (*Id.*). Newell testified that she had once been employed for about four days. (Tr. 66-67). According to Newell, she had been let go but did not know why. (Tr. 68-69). Newell testified that during those four days she "got an attitude" with one of the supervisors, who advised her that her attitude could get her into trouble. (Tr. 70). She testified that she did not think she would have been able to keep that job because there were too many people around her. (Tr. 71).

Peter Manzi ("Manzi"), a vocational expert, also testified during the hearing. (Tr. 71-74, 162). The ALJ asked Manzi whether a person would be able to perform any positions in the national economy who was the same age as Newell, with the same education and vocational profile, who was able to perform the full range of work at all exertional levels and could perform simple tasks, but should avoid concentrated exposure to respiratory irritants and should work in a low-stress environment, meaning they could only occasionally make decisions. (Tr. 71-72). Manzi testified that such an individual would be able to perform the positions of hand packager and bagger. (Tr. 72).

The ALJ then asked Manzi whether a person would be able to perform any positions in the national economy who was the same age as Newell, with the same education and vocational profile, who was able to perform the full range of light work and could perform simple tasks, but should avoid concentrated exposure to respiratory irritants and should work in a

low-stress environment, meaning they could only occasionally make decisions, and should only

have occasional interaction with coworkers, supervisors and the general public.  (Tr. 73).  Manzi

testified that such an individual would be able to perform the positions of photocopy machine

operator and collator operator.  (*Id.*).

   The ALJ then asked Manzi whether the same individual with the same limitations,

but who could perform the full range of work at all exertional levels would be able to perform

the positions of photocopy machine operator and collator operator.  (*Id.*).  Manzi testified that

such an individual could perform those positions.  (*Id.*).  Finally, the ALJ asked Manzi whether

an individual who was limited to light work with the limitations previously identified, who

would be off task twenty percent of the time due to impaired concentration, would be able to

perform any positions available in the national economy.  (Tr. 74).  Manzi testified that such an

individual would not be able to maintain employment.  (*Id.*).

## DISCUSSION

I. **Standard of Review**

   This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  In assessing whether

a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1)   whether the claimant is currently engaged in substantial gainful activity;
>
> (2)   if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)   if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)   if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)   if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

    **A.**    **The ALJ's Decision**

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 15-23).  Under step one of the process, the ALJ found that Newell had not

engaged in substantial gainful activity since December 21, 2011, the application date.  (Tr. 17).

At step two, the ALJ concluded that Newell has the severe impairments of depression, asthma,

and obesity.  (*Id.*).  The ALJ determined that Newell's carpal tunnel syndrome, foot pain, kidney

stones, and arthritis were not severe.  (*Id.*).  At step three, the ALJ determined that Newell does

not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments. (Tr. 18-19). With respect to Newell's mental impairments, the ALJ found that Newell suffered from mild restrictions in activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence, and pace. (*Id.*). The ALJ concluded that Newell has the RFC to perform the full range of work at all exertional levels, but must avoid concentrated exposure to respiratory irritants and must be limited to simple tasks and low stress work involving no more than occasional decision-making. (Tr. 19-22). At steps four and five, the ALJ determined that Newell did not have any relevant past work, but that other jobs existed in the national and regional economy that Newell could perform, including the positions of hand packager and bagger. (Tr. 22-23). Accordingly, the ALJ found that Newell was not disabled. (*Id.*).

## B.   <u>Newell's Contentions</u>

Newell contends that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 12-1). First, Newell contends that the ALJ erred at step two by failing to evaluate whether her PTSD was severe. (*Id.* at 17-22), Next, Newell contends that the ALJ's mental RFC assessment was flawed because the ALJ improperly accorded greater weight to Harding's opinion and improperly rejected the stress limitations identified by Lin. (*Id.* at 22-29). Finally, Newell maintains that remand is required because the ALJ failed to conduct an individualized assessment of Newell's ability to handle stress. (*Id.*).

## II.   Analysis

### A.   Step Two

At step two of the evaluation, the ALJ must determine whether the claimant has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. 404.1520 (a)(4)(ii), (c). "An impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to perform basic work activities." *Jeffords v. Astrue*, 2012 WL 3860800, *3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL 1113534, *8 (E.D.N.Y. 2011)); *see also Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it causes more than a *de minimus* limitation to a claimant's physical or mental ability to do basic work activities"). As a general matter, an error in an "ALJ's severity assessment with regard to a given impairment is harmless . . . 'when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process.'" *Graves v. Astrue*, 2012 WL 4754740, *9 (W.D.N.Y. 2012) (alteration in original) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 154 (N.D.N.Y. 2012)).

Newell maintains that the ALJ failed to consider her PTSD and its associated limitations at step two of the sequential evaluation. (Docket ## 12-1 at 17-22; 17 at 1-5). Newell further maintains that the ALJ's error at step two was not harmless because the ALJ failed to consider her PTSD during the remainder of the sequential evaluation. (*Id.*). According to Newell, her PTSD symptoms and related limitations differ from the symptoms and limitations caused by her other mental disorders. (*Id.*). Further, she maintains that the ALJ might not have

rejected the stress limitation identified by Lin had he appreciated that she suffered from PTSD. (*Id.*).

I agree with Newell that the record demonstrates that she was diagnosed with PTSD by several different medical sources and that the ALJ should have considered all of Newell's diagnosed mental impairments, including her PTSD, in conducting his step two severity analysis. Nevertheless, I find the ALJ's failure to do so in this case was harmless because the ALJ expressly considered the medical evidence of record, including Newell's PTSD diagnosis, in his decision and considered the combined impact that Newell's mental impairments had on her functioning in assessing her RFC and evaluating her ability to perform work. *See Graves v. Astrue*, 2012 WL 4754740 at \*9 (nonsevere finding at step two harmless where the ALJ "considered [claimant's] learning disability and its effect on her ability to work during the balance of the sequential evaluation process"); *see also Schifano v. Astrue*, 2013 WL 2898058 at \*3 ("[w]here a finding of a severe impairment is improperly omitted, the error may be deemed harmless where the disability analysis continues and the ALJ considers the omitted impairment in the RFC determination") (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)).

Newell maintains that the ALJ's decision demonstrates that he failed to consider Newell's PTSD during his sequential evaluation. I disagree. Contrary to Newell's contention that "the ALJ did not refer to Ms. Newell's PTSD at all in his decision" (Docket # 12-1 at 17-18), the ALJ expressly referenced Newell's PTSD diagnosis in his discussion of her medical records and noted that she complained of nightmares and difficulty sleeping. (Tr. 20-21).

Newell maintains that the ALJ's failure at step two was not harmless because the limitations caused by her PTSD differ significantly from those caused by her other mental

impairments and the ALJ failed to account for those PTSD-related limitations in his analysis.
(Docket ## 12-1 at 19-21; 17 at 3-5).  Although Newell's submissions identify differences
between the conditions of PTSD and depression (*see* Docket # 12-1 at 19-20), Newell fails to
identify any actual symptoms or functional limitations she suffers as a result of the PTSD
diagnosis that were not considered by the ALJ.  Newell suggests that her PTSD causes
flashbacks, resulting in irritability and anger – the same symptoms that Newell testified were
caused by her bipolar disorder.  (Tr. 50-51).  Indeed, Newell testified that her PTSD and bipolar
disorder caused the same limitations, with the only exception of nightmares, a symptom that has
no apparent bearing on her RFC.  (Tr. 52 ("Q: And is this different from what you've described
happening because of your bipolar disorder?  A: No . . . [i]t's similar, but the only thing is . . .
with the [PTSD], at nighttime, I go through with my nightmares")).

   Newell's arguments relating to the ALJ's rejection of Lin's stress-related opinion
are unavailing for the same reason.  (Docket # 12-1 at 20-22).  Although Newell maintains that
the ALJ's failure to consider PTSD resulted in his improper rejection of Lin's assessed
stress-related limitation, Newell has failed to identify any stress-related symptoms or limitations
associated only with PTSD, rather than with Newell's other mental health impairments.
Although Newell suggests that her irritability, anger and "blacking out" relate solely to her
PTSD (*id.* at 21-22), Newell's own testimony that her PTSD and bipolar disorder conditions
cause similar symptoms of irritability and anger suggests to the contrary.[5]  (Tr. 50-52).  Thus,
there is no basis to conclude that the ALJ's failure to consider PTSD at step two caused him to
improperly reject the stress-limitation identified by Lin.

---

   [5]  Indeed, nothing in the record suggests that the one instance of "blacking out" contained in the record was
triggered by her PTSD; rather, it occurred when she was angry and arguing with her girlfriend and she reported to
Hann that she believed it was a side effect of the medication Abilify.  (Tr. 448-49).

Although the ALJ's decision could have identified more clearly the symptoms associated with each of Newell's diagnosed mental impairments, his decision summarized the medical evidence relating to Newell's mental impairments and the associated medical opinions of record.  The decision reflects that the ALJ evaluated all of the limitations identified by Newell, irrespective of whether he associated those impairments with a particular diagnosis.  Newell has failed to identify any symptom or limitation that was not considered by the ALJ, much less one that was solely associated with her PTSD.  Accordingly, I conclude that the ALJ's error at step two was harmless.  *See Calixte v. Colvin*, 2016 WL 1306533, *23 (E.D.N.Y. 2016) (error in not evaluating PTSD at step two harmless where ALJ discussed PTSD diagnosis and related symptoms in subsequent analysis); *Chandler v. Colvin*, 2014 WL 4809902, *16 (D.S.C. 2014) (step two error was harmless; "[a]lthough the ALJ did not mention anxiety as a separate impairment, [p]laintiff has failed to indicate any limitation cause[d] by the anxiety that was not considered by the ALJ in addressing [p]laintiff's limitations caused by PTSD"); *Hadaway v. Comm'r of Soc. Sec. Admin.*, 2013 WL 5423955, *2 (D. Md. 2013) (failure to evaluate PTSD at step two was harmless; "[s]ignficantly, however, [plaintiff] does not cite to any functional limitations inherent in either personality disorder or PTSD that the ALJ did not already consider in connection with [plaintiff's] other severe mental impairment[;] . . . the ALJ's RFC analysis correctly considered all of [plaintiff's] limitations, without attributing those limitations to any particular diagnosis"); *Kuharski v. Colvin*, 2013 WL 3766576, *3 (E.D. Ca. 2013) (failure at step two was harmless where "[a]lthough the record establishes the fact of [the PTSD] diagnosis, there is no evidence that plaintiff's PTSD, as distinct from his other impairments, limited plaintiff's ability to perform work-related activities"), *amended on other grounds*, 2014 WL 3385183 (E.D. Cal. 2014); *Mettler v. Astrue*, 2013 WL 549989, *5 n.5 (W.D. Wash.) ("any error

here is also harmless as the disability determination did not stop at step two, and . . . plaintiff has failed to show that any limitations stemming from her diagnosed PTSD were not properly considered during the later steps of the sequential disability evaluation process"), *report and recommendation adopted*, 2013 WL 530983 (W.D. Wash. 2013).

B.     **Mental RFC Assessment**

I turn next to Newell's contention that the ALJ's RFC assessment was flawed. An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

Newell contends that the ALJ erred by according greater weight to Harding, the non-examining consultant than to Lin, the examining consultant.  (Docket # 12-1 at 22-29). According to Newell, the ALJ failed to provide sufficient reasons for rejecting Lin's opinion that she was unable to appropriately deal with stress.  (*Id.* at 24-26).  Further, Newell maintains the ALJ improperly relied upon Harding's opinion, which was internally inconsistent, contained factual inaccuracies, and was conclusory.  (*Id.* at 26-28).

An ALJ should consider "all medical opinions received regarding the claimant."

*See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R.

§ 404.1527(d)).  When evaluating medical opinions, regardless of their source, the ALJ should

consider the following factors:

>   (1)   the frequency of examination and length, nature, and extent
>          of the treatment relationship;
>
>   (2)   the evidence in support of the physician's opinion;
>
>   (3)   the consistency of the opinion with the record as a whole;
>
>   (4)   whether the opinion is from a specialist; and
>
>   (5)   whatever other factors tend to support or contradict the
>          opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House*

*v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

"There is no requirement that the agency accept the opinion of a consultative examiner

concerning a claimant's limitations."  *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013).

Although I agree with Newell that the ALJ should not have rejected Lin's

assessed stress limitation merely because Lin opined that it was caused by irritability or lack of

motivation, I find that the ALJ provided an otherwise sufficient rationale for his rejection of the

limitation.  The ALJ accorded great weight to Lin's opinion except for the stress portion, which

the ALJ found to be inconsistent with Lin's examination findings and the other information in

the record.  (Tr. 21-22).

Although the opinion does not explicitly identify the particular information that the ALJ found to be inconsistent with Lin's stress-related limitation, his decision as a whole reveals the basis of his determination. *See Gladney v. Astrue*, 2014 WL 3557997, *14 (W.D.N.Y. 2014) (ALJ's failure to clearly articulate basis for his determination was harmless where it was "possible to glean the ALJ's rationale" from a review of the entire decision). The ALJ recounted portions of Lin's examination that demonstrated, among other things, a cooperative demeanor, adequate manner of relating, appropriate eye contact, fluent and clear speech, coherent and goal-directed thought processes, intact attention and concentration, and good insight and judgment. (Tr. 21). According to the ALJ, Lin's examination, along with the other mental status examinations contained in the record, demonstrated "largely normal" findings. (Tr. 22). Further, the ALJ noted that Newell's essentially unimpaired activities of daily living were inconsistent with her allegations of disability due to mental health complaints. (*Id.*). I conclude that the ALJ did not improperly reject the stress-related limitation assessed by Lin for these reasons. *See Harrington v. Colvin*, 2015 WL 790756, *16 (W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed limitations that were inconsistent with findings contained in the treatment records and with admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (ALJ properly weighed treating physician opinion and "adequately explained her reasons for declining to grant controlling weight to his conclusion" where opinion was "inconsistent with other opinions in the record, as well as statements made by the plaintiff himself, and none of the objective test records . . . indicate[d] a level of disability greater than that reflected in the plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL

4411655, *5 (N.D.N.Y. 2008) (ALJ properly discounted opinion of treating physician where it was inconsistent with treatment records and objective findings of the consultative examiner).

For similar reasons, I reject any suggestion that the ALJ's determination to reject Lin's stress-related limitation was improper "cherry-picking."  (Docket # 17 at 8).  "[T]he record demonstrates that the [ALJ] carefully reviewed the entire record . . . and declined to adopt those [limitations] that were unsupported."  *See Cosme v. Colvin*, 2016 WL 4154280, *12 (W.D.N.Y. 2016) (rejecting argument that the ALJ inappropriately adopted only those limitations that supported his ultimate finding where the decision demonstrated that the ALJ carefully considered conflicting evidence and provided the basis for his decision to adopt only portions of medical opinion).

I also disagree with Newell's contention that the ALJ erred by according "great weight" to Harding's opinion.  (Docket # 12-1 at 26-29).  As an initial matter, a non-examining physician opinion may be entitled more weight than the opinion of an examining physician (*see id.* at 28), such as where the opinion of a treating or examining physician is contradicted by substantial evidence in the record.  *O'Grady v. Astrue*, 2012 WL 3727220, *19 (D. Conn. 2012) ("[w]here the opinion of the treating physician is inconsistent with other substantial evidence in the record and, therefore, not entitled to controlling weight, an opinion of a non-examining doctor that is consistent with substantial evidence in the record may be afforded controlling weight"); *Cyr v. Astrue*, 2011 WL 3652493, *11 (D. Conn. 2011) ("if the treating physician's opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts, it is not entitled to controlling weight[;] . . . [i]n this case, [the treating physician's] opinion is contradicted by substantial evidence in the record, which means that the opinion of a non-examining DDS doctor can be entitled to controlling weight").

Equally unavailing is Newell's suggestion that the non-examining physician's opinion was too conclusory to be given weight.  (*Id.* at 27-28).  A review of Harding's RFC assessment reflects that his opinion was based upon his review of Newell's medical records and Lin's assessment.  (Tr. 322).  Nor was Harding's assessment that Newell suffered from moderate limitations in her ability to complete several work-related functions inconsistent with his ultimate conclusion that she retained the ability to perform unskilled work.  *See Burgos v. Astrue*, 2010 WL 3829108, *6 (D. Conn. 2010) ("the fact that [the doctors] indicated that the [p]laintiff had moderate limitations on her work abilities is not inconsistent with their ultimate conclusion that she was able to work at a job involving simple and routine tasks").

Newell also argues that the ALJ erred in according Harding's opinion great weight because it inaccurately recited portions of Lin's report.  (Docket ## 12-1 at 27-28; 17 at 5-7).  Contrary to Newell's contention, I do not read Lin's opinion to conclude that Newell was completely unable to deal with stress.  Rather, Lin stated: "[Newell] cannot appropriately deal with stress.  *Difficulties* are caused by lack of motivation and irritability."  (Tr. 292; emphasis added).  The use of the word "difficulties" suggests that Lin concluded that Newell's ability to deal with stress was limited.  Further, although Newell is correct that Harding inaccurately recounted Lin's assessment of Newell's cognitive abilities, Harding's error does not render improper the ALJ's reliance on Harding's opinion.  Despite their divergent opinions of Newell's ability to deal with stress, both Lin and Harding concurred that Newell was cognitively capable of performing simple work.  According to Lin, Newell's ability to deal appropriately with stress was impaired by her lack of motivation and irritability, not by cognitive deficits.  Thus, Harding's inaccurate recitation of Lin's assessment was harmless.

I turn last to Newell's argument that the ALJ failed to conduct an individualized assessment of Newell's ability to handle stress in accordance with Social Security Ruling 85-15. (Docket # 12-1 at 29-30). That ruling "emphasizes the need to carefully evaluate a claimant's ability to deal with stress in the workplace." *Sheffield v. Astrue*, 2012 WL 5966610, *2 (N.D.N.Y. 2012) (citing SSR 85-15, 1985 WL 56857, *5-6 (1985)). According to Newell, although the ALJ included stress-related limitations in his RFC, remand is required because the ALJ failed to make "an individualized assessment" of Newell's ability to handle stress.

Although the ALJ rejected Lin's opinion insofar as it could be read to find that Newell was unable to handle any stress, he did assess stress-related limitations in formulating Newell's RFC. (Tr. 19, 22). As his opinion makes clear, the ALJ concluded that the record demonstrated that Newell had "some difficulty handling stress." (Tr. 22). The ALJ stated that he accounted for these difficulties by limiting Newell to "low stress work," or work involving "occasional decision making." (Tr. 19, 22). The ALJ's conclusion was supported by Harding's opinion that Newell could perform the four basic requirements of unskilled work and by the remainder of Lin's opinion that Newell retained the ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration and a regular schedule, and learn new tasks. (Tr. 292, 322). The ALJ also reasoned that his conclusion was consistent with Newell's medical records, which demonstrated that her "mental status examinations are largely normal," and her reported activities of daily living, which were essentially unimpaired. (Tr. 22). On this record, I am "unpersuaded that remand is necessary for a more extensive discussion of [Newell's] ability to perform" low stress work involving occasional decision-making. *Tremblay v. Colvin*, 2014 WL 4745762, *6 (W.D.N.Y. 2014).

In sum, I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence.  Accordingly, remand is not warranted.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

## **CONCLUSION**

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 16)** is **GRANTED**.  Newell's motion for judgment on the pleadings **(Docket # 12)** is **DENIED**, and Newell's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       August 30, 2016